JOHN W. HUBER, United States Attorney (#7226)
JOHN K. MANGUM, Assistant United States Attorney (#2072)
111 South Main Street, #1800
Salt Lake City, Utah  84111
Telephone:  (801) 325-3216
john.mangum@usdoj.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES BUREAU OF LAND MANAGEMENT, and PAUL BRIGGS, in his official capacity as Cedar City Field Office Manager,<br><br>Defendants. | Civil No. 2:17-cv-01166 JNP<br><br>**DEFENDANTS' MEMORANDUM OPPOSING THE MOTION FOR A TEMPORARY RESTRAINING ORDER OR OTHER INJUNCTIVE RELIEF**<br><br>Honorable Jill N. Parrish |

The United States Department of the Interior, the United States Bureau of Land Management, and Paul Briggs (collectively "BLM"), oppose the motion for a temporary restraining order ("TRO")  or other injunctive relief sought by Southern Utah Wilderness Alliance ("SUWA"). As shown below, SUWA has failed to carry its burden to obtain emergency injunctive relief because it is unlikely to succeed on the merits, does not show imminent and irreparable harm, and has not established that the balance of harms and the public interest supports such relief. Therefore, this Court should deny SUWA's motion for a TRO or other

injunctive relief.

## SUMMARY OF THE ARGUMENT

SUWA seeks a TRO to stop BLM from executing two vegetative treatment projects in the Hamlin Valley in Iron and Beaver Counties, Utah. BLM plans to use vegetative treatments in the Indian Peak and Stateline project areas. The vegetation treatments are designed to improve wildlife habitat and restore native vegetation to the Hamlin Valley and also to reduce fuels that could contribute to wildfires. These vegetation treatments involve chaining or using a bull hog to remove encroaching pinyon pines and juniper trees from 4,159 acres.

This court should deny SUWA's request for injunctive relief because it has failed to satisfy all of the four standard criteria for injunctive relief. On the merits, SUWA fails to acknowledge that the Indian Peak and Stateline Chaining/Bull Hog Project Determination of NEPA Adequacy (DNA) (SUWA Exh. 8 in ECF no. 8-9) is the culminating review of many different NEPA analyses. After the 2014 EA was done, BLM continued to collect survey data of several types which was analyzed. The DNA carefully reviewed BLM's prior NEPA analysis in many earlier information-gathering projects and determined that those analyses sufficiently considered direct, indirect, and cumulative impacts to the site-specific areas at issue. *See* DNA at 4-6. The DNA also concluded that no new information or circumstances warranted further site-specific analysis. *See id*. Finally, the DNA also concluded that the site-specific vegetative treatments were consistent with the methods and actions analyzed in the Alternative A proposed action in the June 2014 Hamlin Valley Resource Protection and Habitat Improvement Project Environmental Assessment (the 2014 EA) (SUWA Exh. 5 in ECF no. 8-6), adopted in the 2014 Final Decision. (That 2014 Final Decision is Exh. A hereto.) *See DNA.* In support of these conclusions in the DNA, BLM first completed reviews of each proposed treatment project called

2

for by Appendix 3 of the 2014 EA, reflected in Internal Project Authorization Forms, and then completed a separate 2017 Interdisciplinary Team Checklist, each of which reviewed all potential resources impacted by the projects, to confirm that the existing analyses were sufficient. *See* DNA, Attachment 2. The DNA also includes site-specific mitigation measures for the following resources: cultural resources; woodland and forest resources; weeds; wildlife; grazing management; riparian soils and hydrology; OHV use; wild horses; and visual resources. *See DNA* at Attachment 3 (Project Design Features). Therefore, additional site-specific NEPA analysis was not necessary for these projects and BLM's decision to rely on the DNA is consistent with the 2014 EA and Final Decision.

In support of its claim of immediate and irreparable harm, SUWA relies on the declaration of Allison Jones, who states that the chaining and bull hog vegetation treatments will destroy 4,159 acres of mature pinyon-juniper woodlands. However, Jones' declaration is at odds with BLM's stated purposes for the project, to restore a more native habitat by removing encroaching trees and improving vegetative communities within the Hamlin Valley, and BLM's conclusions about the effectiveness of the selected vegetative treatments. The Jones' declaration amounts to a difference of professional opinion about the desired end state that is not entitled to any deference. Further, while the vegetation treatments do rely on the use of heavy machinery, SUWA is unable to show that the results of these treatments are irreparable. SUWA also has not shown that the balance of harms and public interest support a TRO on BLM's projects.

SUWA has consistently engaged with BLM about these projects at every opportunity and has been fully apprised of BLM's plans at virtually every step. While SUWA may object to BLM's decision to implement the projects' treatments, SUWA has not identified any issues that BLM has failed to adequately consider. As a result, there is no NEPA violation. Instead, the delay

caused by a TRO will adversely impact wildlife habitat and allow for the continued build-up of

wildfire fuels. It will also undercut BLM's productivity and relationships with the other

stakeholders in the Watershed Restoration Initiative. For these and other reasons, as more fully

explained below, the court should deny SUWA's motion for any injunctive relief.

**BACKGROUND**

**A.  STATUTORY BACKGROUND**

**1.       National Environmental Policy Act**

NEPA serves the dual purpose of informing agency decision-makers of the potential

significant environmental effects of proposed major federal actions and ensuring that relevant

information is made available to the public so that they "may also play a role in both the

decisionmaking process and the implementation of that decision."  *See Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 349 (1989).  To meet these dual purposes, NEPA requires

that an agency prepare a comprehensive environmental impact statement ("EIS") for "major

Federal actions significantly affecting the quality of the human environment."  42 U.S.C. §

4332(2)(C); 40 C.F.R. § 1501.3.  Not every federal action or proposal, however, requires an EIS.

As set forth in the Council on Environmental Quality's ("CEQ") regulations implementing

NEPA, an agency may prepare an environmental assessment ("EA") to determine whether the

impacts of an action may be significant.  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9,

1508.13. An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and

analysis for determining whether to prepare" a more detailed EIS.[1]  *Utah Envtl. Cong. v. Russell*,

---

1 In fact, when NEPA's implementing regulations were enacted, the agency that promulgated
those regulations "has generally advised agencies to keep the length of EAs to not more than
approximately 10-15 pages."  Forty Most Asked Questions Concerning CEQ's National

4

518 F.3d 817, 821 (10th Cir. 2008).  Specifically, an EA "[s]hall include brief discussions of the

need for the proposal, or alternatives . . . of the environmental impacts of the proposed action and

alternatives, and a listing of the agencies and persons consulted." 40 C.F.R. § 1508.9.  After an

EA is completed, if the agency determines there will be no significant impacts arising from the

project then the agency may prepare a finding of no significant impact ("FONSI").  *See* 40 C.F.R.

§ 1508.13.  An agency may tier its analysis to a prior NEPA analysis, meaning that the prior

analysis is incorporated by reference.  40 C.F.R. § 1508.28.  Tiering is appropriate when an

agency first develops a general plan or program and then plans a site-specific project to

implement that plan.  40 C.F.R. § 1508.28(a).  The Department of Interior's regulations further

provide that BLM may rely on existing NEPA analysis for future projects so long as the new

project does not cause additional impacts that have not been previously analyzed.  *See* 43 C.F.R.

§ 43.120.  If after its review of the existing NEPA analyses, BLM determines that no further

analysis is warranted, it may issue a Determination of NEPA Adequacy (DNA).  *See id.* In

reviewing the sufficiency of an agency's NEPA analysis, a court should evaluate whether the

agency has presented a "'reasonably thorough discussion of the significant aspects of the

probable environmental consequences.'"  *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)

(citation omitted).  "Other statutes may impose substantive environmental obligations on federal

agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action."

*Robertson*, 490 U.S. at 351.  A reviewing court is not to "substitute its judgment for that of the

---

Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,037 (March 23, 1981).
Although the regulation pertaining to EAs (40 C.F.R. § 1508.9) has not been substantively
amended since its promulgation, an EA as short as 10-15 pages is a rarity. The principal EA at
issue in this case has more than 200 pages, with appendices running more than an additional 500
pages, not counting the earlier NEPA analyses that it tiered to and subsequent monitoring

agency." *Block*, 690 F.2d at 761.  Rather, "[o]nce satisfied that a proposing agency has taken a

'hard look' at a decision's environmental consequences, the review is at an end."  *Id.* (citing

*Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

       **2.**       **Federal Land Policy and Management Act (FLPMA)**

In 1976, Congress enacted FLPMA, which provides that "the national interest will be best

realized if the public lands and their resources are periodically and systematically inventoried and

their present and future use is projected through a land use planning process coordinated with

other Federal and State planning efforts."  43 U.S.C. § 1701(a)(2). FLPMA charges BLM with

protecting environmental, ecological, and recreational values while also providing for "multiple

use and sustained yield" management.  43 U.S.C. § 1701(a)(7).  BLM develops land use plans to

guide its management of particular areas.  43 U.S.C. § 1712.

**B.**       **FACTUAL BACKGROUND**

       **1.**       **Project Area**

The Hamlin Valley Resource Protection and Habitat Improvement Project area (Hamlin

Valley) straddles Iron and Beaver counties in southwestern Utah.  *See* EA at 51.  The project area

is characterized as being representative of the basin and range topography associated with the

Great Basin and includes pinyon pine and juniper, sagebrush, ponderosa pine, aspen, and mixed

conifer.  *See id.* at 7.  The total project area is approximately 192,000 acres, which includes

148,143 acres of federal public lands managed by BLM.  *See id* at 6, 51.  The remaining lands are

managed by the State of Utah School and Institutional Trust Lands Administration (SITLA) or

held as private property.  Historically, this area has been utilized by livestock, wildlife, and wild

surveys.

horses and has received various vegetation treatments to encourage livestock grazing (primarily crested wheatgrass seeding).  *See id.* at 6.

2.        **Overview of Vegetation Management on Federal Public Lands**

The frequency and severity of wildfires in the western United States has increased significantly in recent years.  This increase is due to changes in vegetation, prior fire suppression polices, drought, and other factors.  *Id.*  The rise of non-native species on federal public lands has also increased over time, at least in part due to prior land management policies that prioritized livestock grazing and other uses.  In response, BLM's vegetation treatments on public lands are increasing. In order to analyze the impacts of this increase in treatments, BLM prepared two programmatic environmental impact statements: (1) Programmatic Environmental Report (PER): Vegetation Treatments on BLM Lands in 17 Western States Programmatic Report (2007); and (2) Programmatic Environmental Impact Statement (PEIS) for Using Herbicides on Bureau of Land Management Lands in 17 Western States (2007).  These programmatic EISs analyzed the potential impacts of mechanical vegetation treatments and chemical treatments on public lands for both wildfire management and improving vegetative species and wildlife habitat. In September 2007, BLM issued two records of decision (RODs) approving the expanded use of certain mechanical treatments and herbicides in 17 western states.  The 2014 Hamlin Valley Resource Protection and Habitat Improvement Project EA and corresponding Final Decision expressly incorporate those RODs into their analysis and decision.  *See* EA at 19-20; Final Decision at 6 (Final Decision adopting Alternative A), 25 (Response to Protest Point 8).

3.        **Hamlin Valley Resource Protection and Habitat Improvement Project Environmental Assessment (2014)**

The Hamlin Valley project area has been identified as a "high priority area for vegetation

7

resource enhancement, resource protection and fuels reduction" based on management decisions in the Pinyon Management Framework Plan (1983).  EA at 8, 9-10.  To achieve these goals, BLM re-initiated work on an environmental assessment in 2010.[2]  Over the course of three years, BLM analyzed impacts and alternatives around the following issues: cultural resources; fire and fuels; grazing management; riparian areas; soils; threatened, endangered, and candidate species; upland vegetation; wildlife; woodlands/forestry; wild horses; noxious weeds and invasive species; special status plants; visual resources; and lands with wilderness characteristics.  *See id.* at 21-24.

In the 2014 EA, BLM analyzed three alternatives.  Alternative A, the proposed action, is an adaptive management strategy designed to "to provide BLM with a prescriptive management oriented plan that can be used to guide a series of habitat improvement and restoration projects throughout the Hamlin Valley project area."  *Id* at 25.  Alternative B is the no action alternative, which would leave the project area in its existing state.  *See id.* at 49.  Alternative C is similar to Alternative A's adaptive management design, but incorporates the use of Tebuthiuron Treatments, a herbicide used to target primarily woody species, including  pinyon pine, and juniper, but especially sagebrush.  *Id.*

Alternative A is an adaptive management strategy designed to allow BLM to continue to collect new information and implement project design changes that reflect that new information as needed.  Rather than establishing a rigid project design, Alternative A is a decision matrix that provides BLM with greater flexibility to respond to changes in both vegetative conditions and

---

2. The Hamlin Valley Project was originally initiated in 2005, but work was delayed until 2010 because of other workload priorities.

landscapes within a large project area.  *See id.* at 26; *see also* Final Decision at 6 ("implement

strategy through planning, design, implementation and monitoring…").  Alternative A is based

on the current vegetative condition of the project area, and provides a wide range of vegetation

prescriptions designed to improve wildlife habitat, restore the vegetative site condition to the

applicable Ecological Site Description[3], and restore the historic fire regime.  *Id.*  The EA

acknowledges that Alternative A is programmatic in nature and does not establish a timeline or

detailed treatment schedule because so much of the work is funding dependent. In addition, BLM

committed in the 2014 EA to conduct a *NEPA review* before undertaking later site-specific

treatments, to determine whether any further NEPA analysis might be needed.  *Id.* at 25. It is

important to understand that this commitment to later NEPA *review* is not the same as a binding

advance commitment to prepare a later environmental assessment or impact statement.

However, the EA also established concrete site-specific survey or monitoring steps the agency

must follow before a site-specific project may begin, to make sure the agency is taking the

appropriate hard look required by NEPA. *Id.* at 30-31. Such surveys and monitoring were done

for the projects at issue to identify resource-appropriate protective Design Features that could be

brought forward from those identified in the 2014 EA, and those surveys were reviewed for

adequacy as part of the DNA review process.

    Under Alternative A, BLM's scoping team divided the Hamlin Valley project area into

---

3. Ecological Site Descriptions (ESDs) are reports generated by the U.S. Dept. of Agriculture's
Natural Resource Conservation Service (NRCS)_ "that provide detailed information about a
particular kind of land – a distinctive Ecological Site.  ESDs describe site characteristics, plant
communities and their state of health, management recommendations, and additional supporting
information. NRCS, *What are Ecological Site Descriptions (ESDs)?available at*
*https://www.nrcs.usda.gov/wps/portal/nrcs/main/national/technical/ecoscience/desc/* (last visited
Nov. 1, 2017).

Vegetation Management Areas (VMAs) containing prioritized Focus Areas, which would prioritize future treatment actions within each VMA, and Wildland Fire Resource Protection Areas (fuel breaks and green strip areas).  *See* 2014 EA at 25 (referencing Map 2 (Vegetation Management Areas) and Map 3 (Focus Areas)) and 32-34.[4]  Under Alternative A's decision matrix, BLM identified several Focus Areas for future treatment. *See id.* at Map 3 (Exh. D) identifying the following Focus Areas: Corridor Focus Area, Sagebrush Focus Area, Fuels Focus Area, and Forestry Focus Area.  Focus Areas comprising 36,033 acres of the Hamlin Valley project area were identified as the result of cooperating agency input and BLM staff field visits between 2005-2012. EA at 25, 33.  In determining Focus Areas, BLM considered four criteria: (1) whether the area is adjacent to existing treatments or planned future treatments on SITLA or private land; (2) whether the area was an historic wildlife travel corridor for sage-grouse or big game; (3) whether the distance from one shrub-steppe community to another is small or invaded by pinyon-pine or juniper; and (4) whether the corridor would provide a valuable fire break to protect natural or community resources.  *See id.* at 33.  Once an area is selected for a proposed treatment, BLM collects monitoring data for any resources or issues identified within that area. *See id.* at 28 (resources and issues a-l listed under 2. Desired Conditions, Management Intent, Management Goals and Objectives of the Project).  This pre-treatment data narrows the list of vegetative treatments BLM may consider.  *See* EA at 29 (5. Method of Vegetation Treatment); *see also* App. 2 (Vegetative Treatment Methods as analyzed in the *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Report*).  Once BLM has identified the applicable treatments, it then conducts a cost benefit analysis to

---

4 Those maps 2 and 3 of the 2014 EA are attached hereto as Exhibits C and D.

determine which treatment will be the most effective in achieving management goals while also

fitting the project budget.  *See id.* at 28-29.  After that, BLM conducts wildlife, cultural, and rare

plant surveys to determine if there any resources or issues within the project area needing special

consideration.  *Id.* at 30.  If any of those resources or issues are identified, then certain design

features are triggered and incorporated into the project specific work to avoid, minimize, or

mitigate problems.  *See* EA at 40-48 (Design Features Common to All Areas).  After a project is

completed, BLM then monitors that project area to determine how successful the treatment was

and incorporates that information into its decision matrix for future projects.  *See id.* at 30-31.

      In addition to this decision matrix, the BLM also analyzed in the 2014 EA the direct and

indirect impacts of vegetation treatments for resource protection and habitat improvement by

resource.  *See* EA at 93-142 (resources studied were cultural resources; fire and fuels; grazing

management; noxious weeds and invasive species; riparian; soils; upland vegetation; wildlife;

woodland/forestry resources; wild horses; BLM sensitive plants; socioeconomic values; visual

resources; and lands with wilderness characteristics).  Further, the EA was also tiered to the

BLM's *Final Programmatic Environmental Report (PER): Vegetation Treatments on BLM*

*Lands in 17 Western States Programmatic Report (2007)*, which analyzed impacts associated

with each of the treatment methods considered under the 2014 EA (App. 2) and provided Design

Features that were incorporated into the EA as well.  These Design Features govern how BLM

will implement vegetative treatments based on what resources lie within a specific project site,

and are consistent with BLM's NEPA mitigation hierarchy to avoid, minimize, and mitigate

impacts.  *See* EA at 40-48.  Thus, the Design Features prohibit any treatment of lands with

wilderness characteristics (EA at 42), rest treated areas from livestock grazing for two years to

promote success (EA at 47); require completion of Class III cultural surveys in advance of any

action (EA at 42); and avoid work during critical wildlife periods (EA at 44-46) and other

actions.  The BLM incorporates appropriate Design Features into each subsequent treatment.

Thus, under Alternative A, once a treatment area is selected, BLM has a limited menu of

treatment methods to choose from based on the known resources in that area, the previously-

analyzed impacts to those resources that each treatment method presents, the goals and objectives

of the treatment, and which tool or treatment method will best allow achievement of those

objectives.  To mitigate against any adverse impacts, Alternative A requires BLM to institute

certain design features (*see* EA at 40-48) and conduct site-specific data collection, including

surveys identifying cultural resources, wildlife, and sensitive plants.  *See* EA at 25 (2.1.2).  This

additional monitoring is then reviewed and analyzed, as reflected in the Internal Project

Authorization Forms,[5] which allows BLM to then determine whether any additional NEPA

analysis is required. *See* EA at 30.

### 4.      Further Project Analysis and Review

In 2013, BLM initially issued a Final EA, a Finding of No Significant Impact (FONSI),

and a proposed decision for the Hamlin Valley Resource Protection and Habitat Improvement

Project.  While SUWA participated in the scoping and public comment periods, it did not protest

the proposed decision.  After further analysis, review, and refinements were added to that 2013

EA, it was re-issued as the 2014 EA, with a Finding of No significant Impact (FONSI)[6] and Final

Decision issued in June 2014.  The Final Decision adopted Alternative A because it best suited

the stated purpose of restoring vegetation to a desired future condition and to improve wildlife

habitat and reduce the risk of catastrophic wildfire.  *See* Final Decision at 16, 8.  Alternative A

---

5 These forms are attached as Exhibits E and F hereto.

also preserved opportunities for stakeholders (including SUWA, *see* EA at 26) to participate in the planning, design, and implementation of site-specific projects.  *See* Final Decision at 16.

On February 8, 2017, BLM published project maps on its ePlanning website of both the Indian Peak and Stateline vegetation treatment areas.  *See* Motion for TRO, Exh. 6.  On February 27, 2017, SUWA sent a letter to BLM expressing concerns about the agency's reliance on a DNA for the projects and a lack of site-specific impacts analysis.  *See* Exh. L.  SUWA's letter did not identify any specific resource concerns within either project area.  *See id.*  On May 31, 2017, BLM responded to SUWA's letter and explained that BLM's NEPA procedures contemplate relying on existing NEPA analysis documents if certain criteria are met: (1) if a proposed action is adequately covered by existing analysis, data, and records; (2) there is no new information or unanticipated or unanalyzed impacts warranting further review; and (3) the Responsible Official determines that the existing NEPA documents are adequate.  *See* Motion for TRO, Exh. 7 (BLM Response Letter (May 31, 2017) referencing 516 Department Manual 11.6 and BLM NEPA Handbook 1790-1).  BLM concluded that there were "no new circumstances, new information or unanticipated environmental impacts that warrant[ed] supplemental analysis" because of the previously-completed extensive vegetation, wildlife, and cultural surveys and BLM's incorporation of the appropriate design features into the final project design based on those surveys.  *Id*.

On August 1, 2017, BLM's Cedar City Field Manager signed the Indian Peak and Stateline Chaining/Bull Hog Project DNA.  The field manager determined that the proposed action to remove pinyon pine and juniper from the sagebrush VMA (Indian Peak) and the

---

6 The 2014 FONSI is attached hereto as Exhibit B.

pinyon-pine and juniper VMA (Stateline) within the 4,159 acre project area conformed with the applicable land use plans, Pinyon Management Framework Plan (1983) and the Utah Approved Resource Management Plan Amendment (2015) and the other applicable NEPA documents.  *See* DNA at 2-3.  The issuance of the DNA confirmed BLM's conclusion that the proposed projects were substantially the same as contemplated by the 2014 EA, which sufficiently analyzed the direct, indirect and cumulative impacts.  *See id.* at 3.  In addition to affirmatively answering the DNA's four primary questions, BLM also completed an updated Interdisciplinary Team Analysis Record Checklist, where resource-specific specialists affirmed that conditions had not changed within the project areas and that further analysis was not required.  *See id.* at Attachment 2.

     **5.**     **Summary of Other NEPA Analyses and Other Documents Referenced by the 2017 DNA**

The 2017 DNA primarily relies on the impacts analysis completed in the 2014 EA and adopted by the 2014 Final Decision.  However, the 2017 DNA also lists five other NEPA documents that informed BLM's determination that  the Indian Peak and Stateline projects did not require additional NEPA analysis.  Those five other documents are described below and show how the 2014 Final Decision's adaptive management strategy creates a circular feedback loop that allows BLM to regularly absorb new information and tailor project designs to reflect the most recent information.

     **a.**     **Indian Peak and Stateline Allotments Grazing Permit Renewals**

Grazing permits for the subject allotments were renewed through a process involving NEPA analysis. Indian Peak (EA-UT-040-07-05 – February 2007) and Stateline (EA-040-07-03 – February 2008).  Through that grazing permit renewal process, BLM analyzed vegetative monitoring data to determine whether the allotments were meeting the Standards and Guidelines

for Rangeland Health and whether any changes to livestock management were required.  BLM

also reviewed and identified grazing management systems through this process to ensure the

maintenance/attainment of the Standards and Guidelines for Rangeland Health.

> **b.**     **Hamlin Valley Project Area Vegetation Monitoring Report (2014)**

This report summarized available vegetative monitoring data (i.e. utilization/use pattern

mapping) that was available for every allotment within the Hamlin Valley EA Project Boundary.

This report is regularly updated by BLM following the collection of grazing monitoring

information, and utilized to ensure that maintenance/attainment of the Standards and Guidelines

is still occurring under livestock grazing management identified in the Indian Peak and Stateline

Allotment Permit Renewals.  BLM generated the report prior to initiating other projects in 2015

within the Hamlin Valley EA Project Area. See list and map of such earlier projects attached as

Exhibits G and H.

> **c.**     **Indian Peak and Stateline Allotments Monitoring Reports (2017)**

BLM prepared these reports to summarize, analyze and interpret several varieties of

pertinent monitoring information specific to the sites at issue concerning data reflecting

rangeland health that was collected for many years, including information collected in years after

the 2014 EA. These reports are attached as exhibits I and J.  They include site-specific

precipitation records. Plant data recorded and assessed in each of these two reports included

Basal Gap, (a measurement of the extent and distribution of gaps between plant bases at the soil

surface along a transect line), Canopy Gap, (a measurement of the extent and distribution of gaps

between plant canopies along a transect line), Line Point Intercept, (number of "hits" of target

species at equidistant points along a transect line, used to quantify soil cover),  and herbaceous

species height (for sage grouse data). BLM prepared Rangeland Health Assessments to assess

soil site stability, hydrologic function, and biotic integrity. These assessments indicate the overall health of the site (i.e., resistance to erosion, soil permeability, diversity of vegetative community, etc.). The BLM also prepared reports of the numbers of livestock actual using the areas and use pattern maps within the Indian Peak and Stateline Allotments.  Furthermore, these data were utilized to identify/verify the climax plant communities or ecological sites within the Indian Peak and Stateline Vegetation Treatment project areas.  This information is used to determine the Desired Future Condition (DFC) of the area to ensure that proposed management/vegetation treatments move the site to the DFC and goals identified in the EA using appropriate treatment methods and seed mixes.  The BLM uses this data also to identify mosaics, leave areas or islands left untreated, recognizing variations in ecological sites.

> **d.    Indian Peak Project Area Pre-Field Assessment, Baseline Inventory and Monitoring Report (2016, 2017)**

This report presents the results of wildlife surveys and monitoring within the Indian Peak project area completed in 2016 and 2017.

The primary objectives were:

a.  Identification and evaluation of flora and fauna communities;

b.  Identification and evaluation of BLM Special Status Species and other species of management concern;

c.  Identify and emphasize important protection, management and restoration opportunities; and

d.  Interpret and provide inventory and monitoring data for the project area to the interdisciplinary team.

The data that BLM collected through wildlife surveys and monitoring were utilized to

assure appropriate mitigation through application of the Design Features identified in the EA.

*See e.g.* EA at 44-46 (Migratory Birds and Raptors - Section 2.1.5).

   **e.   Stateline Project Area (Hamlin Valley Habitat Improvement Project) Pre-Field Assessment, Baseline Inventory and Monitoring Report (2017)**

   This report presents the results of wildlife surveys and monitoring within the Stateline project area completed in 2017.

   The primary objectives were the same as in the corresponding Indian Peak report, but also included two more:

   a.   Create and maintain habitat adequate to meet the needs of Greater Sage grouse in nesting, brood rearing and winter habitats, and

   b.   Improve health, composition, and diversity of shrubs, grasses, and forbs.

   The data that BLM collected through wildlife surveys and monitoring were again utilized to assure appropriate mitigation through application of the Design Features identified in the EA.

*See e.g.* EA at 44-46 (Migratory Birds and Raptors - Section 2.1.5).

   **f.   Indian Peak and Stateline Cultural Resource Surveys**

   The 2014 Final Decision committed BLM to conducting pedestrian Class III cultural resource surveys and completing Section 106 consultation with the State Historic Preservation Office (SHPO) in a site-specific project area before initiating any ground disturbing activities.

*See* Final Decision at 6 (adopting Alternative A; *see also* EA at 30, 42, 94.  In 2016, BLM, in collaboration with DWR and WRI, issued a contract to complete 10,102 acres of Class III cultural survey work, which included all lands within the Indian Peak project area (3,219 acres).  On June 2, 2017, BLM submitted a report to the Utah State Historic Preservation Office (SHPO) seeking that office's concurrence that BLM could proceed with its planned work in conformance

with the National Historic Preservation Act, 54 U.S.C. §300101 *et seq.*  On June 23, 2017, SHPO

formally concurred with BLM's determination of eligibility and effect for the Indian Peak

chaining and bull hog work.

In 2017, BLM issued a contract for the completion of a Class III survey on 1,376 acres

within the Hamlin Valley that included the entire Stateline project area (940 acres).  On

September 26, 2017, BLM submitted a report summarizing the findings of that survey and a

request for concurrence from SHPO that the Stateline project area does not contain cultural

resources that will be affected by the bull hog vegetation treatment.  On October 10, 2017, SHPO

formally concurred with BLM's determination.


## ARGUMENT

## STANDARD OF REVIEW

SUWA seeks judicial review of the federal defendants' decision pursuant to the

Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. (APA).  When reviewing final agency

action, "[a] presumption of validity attaches to the agency action and the burden of proof rests

with the appellants who challenge such action."  *Citizens Comm. to Save Our Canyons v.

Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (citations and quotation omitted).  Therefore,

SUWA must show, under section 706 of the APA, based on the record before the federal

defendants, that their analysis of the proposed project was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Citizens to

Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14, 419 (1971); *Custer County Action

Ass'n. v. Garvey*, 256 F.3d 1024, 1029 (10th Cir. 2001); and *Colorado Envtl. Coalition v.

Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999).

In applying the arbitrary and capricious standard, this Court must determine whether the BLM's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  S*ee Citizens to Preserve Overton Park,* 401 U.S. at 416.  Although this inquiry must be thorough, the standard of review is narrow and highly deferential.  *Id.*; *see also id.* at 415 ("[T]he Secretary's decision is entitled to a presumption of regularity.)  This Court cannot substitute its judgment for that of the BLM, *id.* at 416, and its decision must "be upheld so long as [it] do[es] not collide directly with substantive statutory commands and so long as procedural corners [have been] squarely turned," *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995) (citation and quotation marks omitted).  Judicial deference is especially appropriate where the challenged decisions involve, as they do here, "technical or scientific matters within the agency's area of expertise." *Id.*; see also *Marsh v. Oregon Natural Res. Council, Inc.*, 490 U.S. 360, 378 (1989).

## I.  SUWA FAILS TO CARRY ITS BURDEN OF PROOF FOR INJUNCTIVE RELIEF

A request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2948 (2d ed. 1995) (emphasis in Supreme Court opinion).

To carry its burden, SUWA must show all of the following: "(1) a likelihood of success on the merits; (2) a likelihood that [SUWA] will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in [SUWA's] favor; and (4) the preliminary injunction is in

the public interest." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting

*Republican Party of N.M. v. King,* 741 F.3d 1089, 1092 (10th Cir. 2013)). As shown below,

SUWA cannot make a "clear showing" that it can carry its burden on any of these required four

elements for injunctive relief.

        **A.**      <u>**SUWA is Unlikely to Succeed on the Merits of its NEPA Claim**</u>

        **1.**      <u>**Legal Framework**</u>

BLM's NEPA regulations encourage agency decision makers to rely on existing NEPA

analysis when "assessing the impacts of a proposed action and any alternatives."  43 C.F.R. §

46.120(a) and (d) (encouraging Responsible officials to "make the best use of existing NEPA

documents by supplementing, tiering to, incorporating by reference, or adopting previous NEPA

environmental analysis to avoid redundancy and unnecessary paperwork.").  The regulations

provide decision makers considerable discretion to determine when to fully rely on a prior NEPA

analysis as long as the decision makers document whether "new circumstances, new information

or changes in the action or its impacts not previously analyzed may result in significantly

different environmental effects."  *Id.* at (c).

While a DNA is not a NEPA document containing new NEPA analysis, it does

memorialize that BLM reviewed prior NEPA analysis and confirmed that additional NEPA

analysis is not necessary because there has not been any new significant change to the status quo

described in the other existing NEPA analyses.  *See* H-1790-1 at 22 (Chap. 5 – Using Existing

Environmental Analyses) *available at*

https://www.ntc.blm.gov/krc/uploads/366/NEPAHandbook_H-1790_508.pdf  (last visited on

Oct. 27, 2017); *see also* letter from Elizabeth Burghard to Kya Marienfield (Mar. 9, 2016)

(distinguishing the difference between NEPA review and NEPA analysis in Hamlin Valley).

Exhibit K. BLM's NEPA Handbook further provides detailed guidance on how and when a

decision maker may rely on existing NEPA analysis to determine whether that analysis

sufficiently covers a new proposed action. *See id.* at 21.  The NEPA Handbook requires BLM to

affirmatively answer four sets of questions before it may conclude that an existing environmental

analysis is sufficient:

- Is the new proposed action a feature of, or essentially similar to, an alternative analyzed in the existing NEPA document(s)? Is the project within the same analysis area, or if the project location is different, are the geographic and resource conditions sufficiently similar to those analyzed in the existing NEPA document(s)? If there are differences, can you explain why they are not substantial?
- Is the range of alternatives analyzed in the existing NEPA document(s) appropriate with respect to the new proposed action, given current environmental concerns, interests, and resource values?
- Is the existing analysis valid in light of any new information or circumstances (such as rangeland health standard assessments, recent endangered species listings, updated lists of BLM-sensitive species)? Can you reasonably conclude that new information and new circumstances would not substantially change the analysis of the new proposed action?
- Are the direct, indirect, and cumulative effects that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing NEPA document?

*Id.* at 23.  If BLM affirmatively answers those four sets of questions and documents its

review in a DNA, the proposed action may proceed without further NRPA analysis.

2.      **BLM Properly Relied on the 2017 DNA's Review of the Existing NEPA Analyses Before Beginning the Vegetative Treatments in the Indian Creek and Stateline Project Areas**.

SUWA cannot make a "clear showing" that it is likely to prevail on the merits because BLM's BLM's reliance on the DNA before beginning the vegetative treatment projects was consistent with both the Department of Interior's NEPA regulations and agency policy. Through the Hamlin Valley EA and Final Decision, BLM tiered to the 2007 EIS, which included a comprehensive analysis of all vegetation treatment methods considered in the 2014 EA. *See* EA at 19-20, App. 2.  In the 2014 EA, BLM further narrowed which treatments it would consider implementing in particular areas within the larger Hamlin Valley project area (192,000 acres) by establishing Vegetation Management Areas (VMA), based on the predominant vegetative communities and prioritized focus areas within each VMA (36,033 acres total).  *See* EA at 25 (listing the six VMAs as "sagebrush, pinyon pine/juniper woodland, mountain shrub, riparian, and forested sites including aspen and mixed conifer"), 32-34; *see also* EA at Map 2 and Map 3 (identifying the following Focus Areas: Corridor Focus Area, Sagebrush Focus Area, Fuels Focus Area, and Forestry Focus Area).  While the EA did not discuss specific impacts to specific acres, it did adequately consider the impacts associated with vegetative treatments within each VMA and how those impacts would affect the goal of habitat improvement and restoration goals identified by the desired future conditions.  BLM also committed to continuing to gather monitoring data for cultural resources, wildlife, and sensitive plant species before initiating any site-specific project.  BLM completed such monitoring between June 2016 and June 2017.  *See supra* section B.5. (summarizing BLM's monitoring and surveying reports and other NEPA

documents the agency relied upon to complete the DNA); *see also* DNA at 3 (Section C).

While the 2014 Final Decision acknowledges the programmatic nature of the EA, BLM never committed to conducting additional full-fledged EAs or EISs after that 2014 Decision, but only committed to doing the site-specific surveys and monitoring required by the 2014 documents to determine whether any further NEPA analysis might be needed.  *Compare* Motion for TRO at 15 (claiming BLM committed to further NEPA analysis) *with* Final Decision at 7 ("Site specific actions would be subject to additional NEPA review."); *see also* EA at 25; Exhs. 7 and K (Letters from BLM to SUWA (responding to SUWA's request for additional NEPA analysis and explaining that BLM was only contemplating future review)).  The commitment to site specific NEPA review as well as the inclusion of the Internal Project Authorization Form (EA at App. 3, reflected in Exhs. E & F) signaled BLM's intention to utilize DNAs in the future, and subsequent correspondence between the parties in 2016 and 2017 confirm it.

Given the several site-specific surveys completed after the 2014 EA, the data from which confirmed to BLM that there were no new environmental issues not already analyzed and addressed by the range of impacts analyzed in the programmatic EA, there was no need to do any further NEPA analysis than had already been done for the Indian Peak and Stateline projects. SUWA has no likelihood of prevailing on the merits of its claims.

### B.     SUWA Will Not Suffer Immediate and Irreparable Harm When the Project Proceeds.

SUWA claims that it will suffer immediate and irreparable harm from the planned vegetation treatments if the TRO is not granted.  In support of this claim, it provides the declaration of Allison Jones, who has recently visited the project areas and determined that they contain healthy

and mature pinyon-juniper woodlands.  *See* Motion for TRO at 20.  Jones posits that chaining

and bull hogging will cause harm to those woodland communities and they will require many

years to recover.  *See id.* at Exh. 11 ¶¶ 24-25, 27.  However, Jones' declaration amounts to

nothing more than a different opinion about the desired end state of the land to be treated and is

at odds with the stated purposes of the projects and the desired climax plant communities or

Ecological Site Descriptions.  In such instances, BLM's experts and their conclusions should

receive deference.  <u>Marsh</u>, 490 U.S. at 378.

    The purpose of this project is to restore and improve various components of the vegetation

communities within the Hamlin Valley project area, specifically focusing where sagebrush has

been encroached upon by "pinyon pine and juniper and pinyon pine and juniper woodlands with

little to no understory."  EA at 8.  BLM further determined that doing so will result in improved

habitat for the greater sage-grouse and other wildlife and livestock and will also provide other

landscape benefits, including a reduced risk of devastating wildland fire effects.  *See id.*   These

sought for benefits are reasonably anticipated within just a few years. See photos attached as

Exhibit O. This conclusion contradicts SUWA's conclusory claim that its members will be

irreparably harmed by the loss of encroaching woodlands it seeks to preserve and foster. All

woodlands in the project area are not being removed.  Much acreage of those woodlands will

remain.   SUWA's desire to be able to view mature woodlands where once grasslands prevailed

on lower slopes does not trump the fact that healthy grasslands sought by the project within just a

few years will produce benefits not achievable without these treatments. This restoration does not

equate to irreparable harm.

C.      **The Balance of Harms Favors Allowing BLM to Proceed with the Project**

The balance of harms tips in BLM's favor because any further delay will jeopardize the full effectiveness of the projects, already largely seeded, and the landscape changes resulting from the treatments are not irreparable when one realizes that BLM and its partners desire a soon-to-be-achieved restoration of historic habitat that will benefit wildlife and reduce fire risks, rather than the encroaching woodlands SUWA seeks to preserve.

BLM and its state and private partners will suffer immediate harm if the TRO is granted. BLM and its partners have already invested in and distributed perennial grass and forb seeds in the Indian Peak project area on October 13 and 16, 2017.  If BLM and its partners are prevented from performing further treatment in that area, then it is unlikely the seed will produce the intended vegetative results and be wasted. See accompanying Declaration of Tyler Thompson, Exhibit M hereto, at ¶ ¶ 22-29. As discussed in the EA, the main goal of seeding is reduce competing vegetation (e.g. crested wheatgrass).  *See* EA, App. 2 at 14-16 (Basic Criteria for Successful Revegetation) (unpaginated).[7]  New seed has the highest rate of success when it is distributed "immediately before the season of the most reliable rainfall and when temperature is favorable for plant establishment.  *See id.* (10. Use Correct Seeding Dates).  Given the location and elevation of the Indian Peak project area, the ideal time to establish new seed is now. Further, BLM's window of opportunity to implement these treatments is very narrow because of the impacts the project treatments have on wildlife at other times during the year.  *See* EA at 44-46 (describing critical wildlife periods to avoid or minimize treatment work).

BLM has voluntarily stood down on all work in the project areas on federal lands since October 20, 2017, after SUWA presented it with a draft complaint, to allow time to obtain a court ruling.  While BLM has not yet initiated any work on the ground in the Stateline project area, it has also refrained from preparing contracts and organizing labor and equipment for that smaller project.  In the Indian Peak project area, BLM's partner, the Utah Division of Wildlife Resources, has already aerially distributed all the planned seed, but BLM has been constrained by this litigation from further implementing other vegetation treatment on the federally-managed lands of that project. As the optimal weather window continues to shrink for the contemplated work, BLM risks losing any ability to complete the projects and having its previous seeding efforts wasted.

While there will be some financial injury to BLM and its partners as a result of any delay, further delay also creates political tensions with BLM's partners and stakeholders in these projects.  The Watershed Restoration Initiative of which these projects at issue are a part is an example of Federal, State, and local governments and other interests pooling their resources and working collaboratively to address pressing issues on federal and other adjoining lands. See Thompson Declaration at ¶¶ 5-6, 18, & 37-38. This partnership is very important to BLM given the larger tensions federal land managers face and it wants nothing more than to preserve those positive working relationships in Iron and Beaver Counties.

Further, the projects will help to reduce the risk of future devastating fire losses, which more readily occur among dense woodlands than in grassy fields. It is also worth noting that two

---

7 This is attached as Exhibit N hereto.

wildfires (the Paradise and White Rock fires) have occurred within the larger Hamlin Valley

project area since 2007 and that two people were killed in a plane crash during fire suppression

activities for the White Rock fire in 2012. *See* Final Decision at 24 (Response to Protest Point 7).

    Conversely, SUWA claims that its interests are harmed by BLM's alleged but not

substantiated failure to fulfill its obligations under NEPA. But SUWA's members will still be

able to view the remaining woodlands that won't be removed. Further, SUWA has consistently

participated in the planning process for these projects since 2010 and has been well informed of

BLM's intentions at every step.  While SUWA may wish to have the agency engage in further

delaying analytical processes, it has failed to identify any resource concerns that BLM has not

considered.  SUWA also remained silent when BLM performed a similar vegetation treatment in

the larger Hamlin Valley project area in 2016 after completing a different DNA.  If SUWA was

not harmed by that action then, it is duplicitous to argue that it is harmed now. Further, SUWA's

delay in bringing this suit at the last possible moment and requesting BLM stand downs, only

reluctantly agreed to in order to give the court the most informed basis for making its rulings, has

already jeopardized full completion of the projects before winter weather may prevent or hamper

full effectiveness of the treatments.

### D.     The Public Interest Favors Allowing the Projects to Proceed

    SUWA has not clearly shown that BLM has failed to comply with NEPA.  In the absence of a

clear showing, BLM should be allowed to proceed with the projects to improve wildlife habitat

and reduce wildfire risks.  Public interest favors BLM's efforts to achieve the stated purpose for

the 2014 EA: minimizing wildfire risk and improving wildlife habitat by restoring native

vegetation.

## CONCLUSION

For these reasons, the court should deny the motion for a temporary restraining order or other injunctive relief.

DATED this 2nd day of November, 2017.

JOHN W. HUBER
United States Attorney

*/s/ John K. Mangum*
JOHN K. MANGUM
Assistant United States Attorney
Attorneys for Defendants

Agency counsel:
Cameron B. Johnson, Esq.
Office of the Regional Solicitor
U.S. Department of the Interior
125 S. State St. Ste. 6201
Salt Lake City, UT 84138

BLM's EXHIBIT LIST

*Southern Utah Wilderness Alliance v. U.S. Department of The Interior,* et al.
Case No. 2:17-C-01166-JNP

_____

EXHIBIT A:   2014 Final Decision

EXHIBIT B:   2014 FONSI (Finding of No Significant Impacts)

EXHIBIT C:   Map 2 of 2014 EA

EXHIBIT D:   Map 3 of 2014 EA

EXHIBIT E:   Internal Project Authorization Form for Stateline

EXHIBIT F:   Internal Project Authorization Form for Indian Peak

EXHIBIT G:   List of Earlier Hamlin Valley Projects

EXHIBIT H:   Map of Earlier Hamlin Valley Projects

EXHIBIT I:    2017 Indian Peak Allotment Monitoring Request

EXHIBIT J:    2017 Stateline Allotment Monitoring Request

EXHIBIT K:   March 9, 2016 Letter from BLM to SUWA's Kya Marienfeld

EXHIBIT L:   February 27, 2017 letter from SUWA to BLM

EXHIBIT M:  Declaration of Tyler Thompson

      EXHIBIT M.1:    Curriculum Vitae
      EXHIBIT M.2:    Purchase Order dated 10/03/2017 for SW UT BLM Aerial Seeding Program
      EXHIBIT M.3:    Utah Division of Wildlife Services Invoice for Seeds for Indian Peak Seeding Project
      EXHIBIT M.4:    Utah Division of Wildlife Services Invoice for Seeds for Stateline Hamlin Valley Seeding Project
      EXHIBIT M.5:    Utah Division of Wildlife Services Invoice for Services for Hamlin Valley Habitat Restoration
      EXHIBIT M.6:    Email Detailing Contractor Losses from Delay

EXHIBIT N:   Appendix 2 to 2014 Environmental Assessment

EXHIBIT O:   Before and After Photos of Comparable Treated Areas